**SCHULER, et al v. WALTER, Tax Assessor, et al. (No. 2).**
No. 64-3525-E.
Circuit Court, Duval County.
April 22, 1968.

Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, for the plaintiffs.

Stallings & Marr, J. Henry Blount, William Joe Sears, Jr., Walter C. Shea, and Frank X. Friedman, Jr. of Rogers, Towers, Bailey, Jones & Gay, all of Jacksonville, for the defendants.

WILLIAM L. DURDEN, Circuit Judge.

*Final judgment:* This cause was originally before the court on January 4, 1965, upon the application of the plaintiffs for a final declaratory decree mandatorily enjoining the defendant county tax assessor to revalue all real property in Duval County at 100% fair market value. The requested relief was granted (24 Fla.Supp.116), and this court's decree was affirmed by the Supreme Court. Walter v. Schuler, 176 So.2d 81 (Fla. 1965). Robert A. Mallard, the present county tax assessor and the new tax assessor for the consolidated government of the city of Jacksonville, automatically became a party defendant to this litigation pursuant to the provisions of the Florida Rules of Civil Procedure.

This court in its original decree retained jurisdiction in order to insure substantial compliance by the tax assessor. The tax assessor has previously submitted voluminous periodic reports on the day-to-day progress of the office. The court has held extensive

hearings on various subjects, including the application of the agricultural assessment statute, §193.11(3), Florida Statutes, and the requirement that "one tax roll" be prepared by the county tax assessor for 1968 under the charter for consolidated government of the city of Jacksonville, chapter 67-1320, Laws of Florida.

The tax assessor has submitted an extensive final report supported by numerous documentary exhibits and by oral testimony summarizing the activities of the office since 1965. The cause is presently before the court on a petition to release the tax assessor from continuing and supervisory jurisdiction.

### Basic issue

The simple legal issue before the court is whether the county tax assessor has substantially complied with the provisions of the final decree ordering revaluation on the basis of 100% fair market value. The court has no hesitation in finding that the present ad valorem real property tax roll of Duval County is in *full* compliance with the law of the state of Florida. The basis of the court's finding of full compliance deserves explanation and the events culminating the original order of this court should be reiterated.

### Revaluation chronology

The central issue in this county in 1964 was whether the people could have representation and education without taxation. Intentional and systematic undervaluation of real property for ad valorem tax purposes had been the rule since 1941. The Supreme Court succinctly summed up the situation by stating that "from all accounts the tax roll of Duval County for 1964 is a mess." 176 So.2d 82.

Crash revaluation of all real property in the county was required by this court in 1965. Information of all types and form had to be gathered in an extremely short period of time. The most basic types of equipment had to be purchased by the tax assessor, and his work force had to be increased and was educated in a new tax assessment doctrine, fair market value appraising. Systems, procedures and programs were worked out for the assimilation, analyzing and application of a vast amount of economic information. Problems created by crash revaluation of 200,000 parcels and from lack of public acceptance of a new and higher system of taxation resulted in 20,502 individual protests to the board of equalization contesting the propriety of the assessments placed on a much larger number of parcels. Subsequently, 119 individual lawsuits on property valued in excess of $48,000,000 were filed attacking assessments.

In 1966 an extensive refinement program was necessary to correct mistakes and errors in judgment in the 1965 revaluation. The refinement was on a crash basis. Old procedures were revamped and new procedures were adopted. Protests numbering 19,980 were filed to the board of equalization contesting the validity of individual assessments, and 68 additional lawsuits contesting in excess of $29,000,000 in value were instituted.

In 1967 under the direction of a new administrative head, Robert A. Mallard, the efforts to revalue property and refine individual assessments were continued. More importantly, a complete administrative reorganization of the office was accomplished. The taxpayers were given individual attention for the purpose of equalizing the tax roll. The expertise of the employees of the tax assessor's office was increased through education programs. Individual appraisal reports were prepared on specialized types of property, and methods and procedures for valuing all types of property based on sound real estate appraising techniques were crystallized. The result: slightly in excess of 700 protests were filed to the board of equalization followed by ten individual lawsuits.

Sales ratio studies were presented to the court in the tax assessor's final report. This study compared the purchase price paid during 1966 and 1967 for 6,219 parcels of property to the 1967 assessed value placed on each parcel. The study reveals that the 1967 tax roll on these parcels is between 90.4% and 90.8% of the value paid by the purchasers. This record of accomplishment constitutes, as a practical matter, maximum compliance with the standard of 100% fair market value.

The desired end has been reached, that is, a legal and equitable tax roll. The means was dedicated work and substantial expenditures of money. The tax assessor is a fee officer. The statutes of the state of Florida provide that he will collect specified fees for assessing intangible, personal and real property. During 1965 and 1966, the assessor collected $2,218,735.75 in fees. The county government followed the unfortunate practice (which this court finds but cannot legally hold inadvisable) of budgeting these fees for general public expenditures rather than allowing them to be used by the assessor's office insofar as necessary.

The total administrative cost of revaluation in 1965 and 1966 was $1,200,475.59. The administrative expenses for preparation of the 1967 tax roll were less than in the past two years, while the tax assessor's office again collected fees in excess of $1,100,000. The court has been presented with a detailed and itemized explanation of the expenditures of the tax assessor's office from 1965

through 1967 and finds that these expenditures were necessary and justified.

The future of the tax assessor's office is more important than past history of accomplishment. This court has neither the power nor the inclination to direct the future operation of the office. The people have elected an official who has this duty and responsibility. Robert A. Mallard has, however, favored this court with a request for comments as to the plans of the assessor's office for the future, and the court should honor that request with a reply.

### Future — computerized fair market valuation

The primary problem facing the tax assessor in the future is to avoid erosion of the present tax roll and to periodically revalue. Fair taxation is not accomplished through illegal reduction of assessments. The budgetary needs of county government directly determine ad valorem real property tax and the reduction of assessed value results in increased tax rates. The tax assessor suggests for the future a valuation program based on use of electronic computers which will undoubtedly require initial expenditure but will result in maintaining the integrity and equality of the tax roll.

The recurring problem throughout 1965, 1966 and 1967 was volume — 200,000-plus parcels of property to value, thousands of man hours to collect information and clerical entries to calculate value and transpose information estimated to number ten million. The future requires correction of the volume problem and, more acutely, a program for the assimilation and analyzation of the magnitude of economic information contained in the assessor's records. The resolution for the assessor's office and perhaps all government depends upon the availability of computers and data processing systems designed to record, assimilate and return information by the punching of a button.

The assessors' office has computers ("hardware") which have been used insofar as possible in tax accounting, that is, printing the preliminary tax roll, the final tax roll, preliminary tax notices and homestead exemption cards. In order to make the best use of the computer hardware already available the office must have a sophisticated data processing system ("software") to avoid the volume of clerical work, to store the vast amount of economic information available to the assessor, and to make this information available to the assessor on a classified and subclassified basis.

The primary purposes of the assessor's office in moving toward computerization are — (1) to operate the office on a business-like and economic basis minimizing administrative costs, (2) to refine

and equalize the present roll periodically, (3) to establish quality control checks to avoid errors in the collection and recordation of information, and (4) to assimilate and analyze all information dealing with the value of real property on a classified basis.

A computerized tax assessment program will not result in a mechanical judgment system. Once sufficient information is collected on a specified subject through a data processing system, a value judgment will be required of the assessor. Sophisticated programs can give the assessor a means to economically gather the information necessary to make value judgments and offer a system whereby the correctness of the judgment can be checked and compared with the values placed on similar types of property across the county.

Representatives of the Duval County Area Planning Board testified at the final hearing to important side benefits resulting from the assessor's office computerizing its information and records. The assessor's office is the center of economic information about the county. Coordination of the assessor's computer programs with the planning board, the chamber of commerce and other private and governmental agencies would make a vast amount of information mutually available.

The court cannot make detailed findings as to the present and future plans for continuing valuation, refinement and equalization through data processing. The court does, in reply to the assessor's request, advise that, in light of the experience in this case and some 200 other tax cases, these plans for the future are sound, commendable and recommended.

*Tax litigation 1965-1967*

This court has been involved since January 4, 1965, in the litigation in this case resulting in the landmark decision of Walter v. Schuler, supra, by the Supreme Court, and in 197 individual lawsuits contesting the validity of ad valorem assessments placed on many times that number of parcels.

The tax assessor was without clearly defined legal standards or specific regulations to resolve the many factual and legal problems raised in the litigation which resulted from revaluation. The Supreme Court had mandated that assessments shall be at 100% fair market value but warned that property cannot be assessed on the basis of speculation and conjecture as to the use which might be made of the property at some future time. Walter v. Schuler, supra; Lanier v. Overstreet, 175 So.2d 521 (Fla. 1965); and Markham v. Blount, 175 So.2d 526 (Fla. 1965). These standards

had to be applied in light of the factors which the legislature has promulgated as a guide to tax assessors in §193.021, Florida Statutes.

The assessor may not speculate or conjecture as to potential future uses of property. In context, this court understands the Supreme Court to have held that an assessor should not speculate, that is, theorize from conjectures without sufficient evidence, and should not conjecture, that is, infer from defective or presumptive evidence. The assessor is obligated to consider the highest and best use to which the property can be expected to be put in the immediate future, along with the present use of the property. This limitation on the assessor is not inconsistent with the guides to determining value established by experts in the field of real estate appraising.

The primary problem in the field of ad valorem real property taxation prior to Walter v. Schuler, supra, revolved around the adjectives used to modify the noun "value." The Supreme Court has held one set of adjectives, "fair market," to govern whenever the issue is the value of real property.

The issue is confused by consideration of the purpose for arriving at value. The term "fair market value" is defined and explained by textual authority in the field of real estate appraising and by experts in this field. The legislature has enacted into law the essential factors which are considered by expert appraisers in determining value under this standard in the eight criteria contained in §193.021, Florida Statutes. A special fair market value test does not exist to determine assessments for ad valorem taxation purposes. To so hold destroys the simplicity of the standard and renders null real estate appraising authority as a guide to determining value.

The single and most important issue which developed in this tax litigation was whether the individual taxpayers would be required to prove their assessments illegal under the standards and guides existing in the field of real estate appraising for determining fair market value. Numerous factual, legal and procedural issues had to be determined in order to reach the ultimate question of fair market value. In hundreds of pages of judicial decrees, we have discussed and determined legal and factual issues which face the tax assessor on a day-to-day basis and which heretofore have been unsettled or undermined by the courts of this state.

The total assessed value of the property involved in this litigation was approximately $80,000,000. At issue was in excess of $240,000 in taxes for each tax year. At the conclusion of this litigation, the tax assessor has collected as a result of settlements based on opinions

of value by expert appraisers or on final decrees entered by this court approximately $400,000 in taxes in addition to the amounts which had been tendered into the registry of the court and admitted by the plaintiffs to be legal and due. The expense to the assessor for costs and attorneys' fees in 1965 and 1966 was approximately $700 per case. Additional expenditures were, of course, necessary by the county to defend this suit and to carry the individual litigation to its conclusion during 1967.

The volume and nature of this litigation necessitated substantial expenditures by the county officials involved. The basic philosophy of the court in making any determination which involved cost was that the attorneys for the assessor were in essence representing the entire county in defense of its taxation system. The taxpayer plaintiffs in a very real sense were in a dilemma not individually caused by them, and therefore the cost of this litigation was passed on insofar as possible to the county as a whole. The expenditures by the county for attorneys' fees and costs in this litigation were justified by the capable and conscientious legal representation which the county received and by the result — a set of legal standards to resolve the most important problems which have and will face the tax assessor.

The plaintiffs who brought this suit for themselves and on behalf of all other taxpayers in the county are also commended for their actions, efforts and expenses in assisting the court in bringing about this improvement, and their counsel are likewise commended for such services as they rendered wholly without fee.

### Conclusion

The tax assessor of Duval County has fully complied with this court's final declaratory decree entered January 4, 1965. The final report submitted by the tax assessor, including the methods and procedures outlined therein, is accepted by the court. The county tax assessor's office no longer needs to be subject to the jurisdiction of this court. It is therefore with considerable pleasure ordered that —

(1) The final declaratory decree entered herein on January 4, 1965, be and the same is confirmed.

(2) All intervening orders regarding the reports of the county tax assessor are likewise ratified and confirmed.

(3) The final report submitted by Robert A. Mallard, as tax assessor of Duval County, is hereby accepted and confirmed.

(4) The consolidated order on defendant Robert A. Mallard's petition for instructions as to the preparation of the 1968 ad

valorem real property tax roll heretofore entered by this court on January 12, 1968, is ratified and confirmed.

(5)  Robert A. Mallard, as tax assessor for the county of Duval, is hereby declared to have fully complied with the terms of the aforesaid declaratory decree entered on January 4, 1965, and is hereby released from the continuing and supervisory jurisdiction by this court.

(6)  Jurisdiction is hereby terminated and concluded.

(7)  Costs are not awarded to any party.